UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| PERRIE BONNER and, | ) | |
| DARRELL BRUCE, | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 2:05-CV-146 PS |
| | ) | |
| v. | ) | |
| | ) | |
| HOME123 CORPORATION and | ) | |
| NEW CENTURY MORTGAGE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Fair Credit Reporting Act prohibits lenders from digging through consumers' credit histories unless those lenders intend to make a firm offer of credit. The FCRA attempts to strike a balance between a consumer's interest in privacy and his interest in having access to credit products. This class action presents a close question as to whether two lenders properly accessed the credit histories of the two named plaintiffs for the permissible purpose of making a firm offer of credit. Both Plaintiffs and Defendants have filed motions for summary judgment. We find that Defendants did not make a firm offer of credit, and therefore, we grant Plaintiffs' motion and deny Defendants' motion.

### I.  FACTUAL BACKGROUND

Plaintiffs received solicitations for first mortgage loans through the U.S. mail from Defendants Home123 Corporation and New Century Mortgage Corporation, two sub-prime mortgage lenders. Plaintiffs Bonner and Bruce each received one letter from New Century in July 2004 and March 2005, respectively, (Pls. St. App. A & C), and Plaintiff Bonner received

one letter from Home123 in February 2005, (*id.*, at App. B).[1]  These solicitations all include language stating: "You have received this offer because we [Defendants] obtained information from one or more credit bureaus identified below . . . ."

Defendants engaged in a "prescreening" process when determining to whom to send the letters.  This process involved first determining the lending criteria that consumers must satisfy to receive mortgage offers.  (5/18/06 H. Addington Aff. ¶ 15, Defs. App. Ex. 6.)  Defendants then hired "credit liaison vendors" that accessed consumers' credit reports and determined which individuals satisfied the pre-established criteria provided by Defendants.  (*Id.* at ¶ 16.)  The criteria consisted of both demographic criteria, such as whether the consumer was a homeowner and whether the home was a single family dwelling, and risk criteria, such as how much new credit the consumer had and whether the consumer had been in bankruptcy.  (11/7/05 H. Addington Aff. ¶¶ 16-21, Pls. St. App. H.)  Defendants modified this criteria in some respects during the class period.  (*Id.* at ¶ 20.)  For example, Defendants initially eliminated those consumers about which Defendants had no information about their homes' market value.  (*Id.* at ¶ 18(b).)  But sometime during the class period, Defendants began to include those consumers as potential prescreened recipients even though there was no information on the market value of their homes.  (*Id.* at ¶ 20(b).)

Once the prescreening process was completed, Defendants learned the names and addresses of those consumers who satisfied Defendants' criteria and who would ultimately

---

[1]  Pls. St. App. refers to Plaintiffs' Appendices attached to their Local Rule 56.1 Statement, and Pls. Mem. App. refers to Plaintiffs' Appendices attached to their Memorandum in support of their Motion for Summary Judgment.  Defs. App. Ex. refers to Defendants' Appendix of Exhibits that was filed with their Motions for Partial Summary Judgment.

receive Defendants' solicitations.  (5/18/06 H. Addington Aff. ¶¶ 16, 20.)  Defendants

subsequently sent letters to those consumers who satisfied the pre-established lending criteria,

including Plaintiffs.  (*Id.* at ¶¶ 15, 23.)  Defendants at no point during the prescreening process

had direct access to consumers' credit reports.  (*Id.* at ¶ 24.)  Plaintiffs did not give permission to

Defendants to obtain their credit reports.  (Answer ¶¶ 20-22, 36-38, 51-53.)

Upon a close examination of the letters, the Court notes that they do not contain an

interest rate or a range of interest rates, or an indication whether the mortgage offer was for a

fixed or variable rate mortgage loan.  Nor do the letters include information about the specific

terms of the loan, the underwriting guidelines, points charged or whether a prepayment penalty

may apply.  The two letters sent by Defendant New Century state that the loan amounts range

from $50,000 to $750,000.  (Pls. St. App. A & C.)  Defendant Home123's letter states that the

minimum loan amount is $50,000.  (*Id.* at App. B.)  All three letters also include the following

language on the reverse sides:

> We will determine the specific terms of your loan based on the
> product you request and the information obtained in processing
> this loan, including, but not limited to, the credit bureau report,
> appraisal, equity in your home and verification of income.  If you
> do not meet the necessary qualifications, other programs are
> available.

The letters also reference appraisal, title search fees and other costs, but do not elaborate on the

amounts of these fees.  Moreover, two letters sent to Plaintiffs Bonner and Bruce (Pls. St. App. B

& C) state: "All loans subject to underwriting approval, including credit verification and

property valuation.  Not all buyers will qualify."

New Century's letters to Plaintiffs also include a cash value (up to $29,510.14 for

3

Plaintiff Bruce, and up to $15,762.87 for Plaintiff Bonner) that Plaintiffs could receive in extra cash upon receiving a mortgage loan.  (*Id.* at App. A & C.)  This cash-back amount was determined during the pre-screening process.  (5/18/06 H. Addington Aff. ¶ 21, Defs. App. Ex. 6.)  The credit liaison vendor applied a calculation – created and provided by Defendants – to a consumer's estimated home value and estimated mortgage balance to determine the maximum cash-back amount.  (*Id.*)  If no estimated home value and mortgage balance were available for the consumer, the letter provided a default cash-back amount.  (*Id.*; H. Addington Dep. at 117, Pls. St. App. F.)  The cash-back amount was only an estimate, and subject to verification based on, among other factors, the borrower's income and creditworthiness.  (H. Addington Dep. at 114; 4/13/06 H. Addington Aff. ¶ 7, Pls. St. App. K.)

Finally, Defendant Home123's letter to Bonner displays a Sample of Savings Worksheet. (Pl. St. App. B.)  The worksheet describes the monthly and yearly savings that would occur "based on a fixed rate $64,700 loan with a 360 month term; APR 8.0849%."  (*Id.*)  The worksheet explicitly notes that "individual results may vary."  (*Id.*)

Once a consumer received a letter and decided he was interested in the mortgage loan offer, he was directed to call a customer service representative at a call center in California.  (H. Addington Dep. at 31, Pls. St. App. F.)  The representative verified that the customer met Defendants' criteria and that he wished to apply for a loan.  (*Id.* at 32.)  After this verification, a loan officer or advisor from an appropriate local branch office was assigned to that potential borrower.  (*Id.* at 32-34, 43.)  The borrower then must authorize Defendants, via the local branch office, to acquire his credit reports.  (*Id.* at 43.)  Furthermore, he must provide certain information unavailable from the credit report, such as income, exact mortgage balance and

desired loan amount.  (*Id.* at 43; 5/18/06 H. Addington Aff. ¶ 25, Defs. App. Ex. 6.)  Based on this additional information and the credit report, Defendants determined whether the applicant met the pre-established criteria and whether the applicant could provide the collateral required for a loan.  (5/18/06 H. Addington Aff. ¶ 26.)  If the consumer met the criteria, the loan officer at one of Defendants' branches then helped navigate the consumer through the underwriting process.  (*Id.* at ¶ 27.)  Even at this point, already well into the process, Defendants still had not provided any specific terms, payments, or interest rates to the consumer.  It is also true, however, that a potential borrower could not be turned down for a first mortgage loan provided he met the pre-established criteria.  (H. Addington Dep. at 42, Pls. St. App. F.)

According to Defendants, the terms of the mortgage loan offered to consumers were based on several factors, including the type and amount of the loan desired, the creditworthiness of the consumer, the ratio of the loan amount to the value of the home being mortgaged, the type of property serving as collateral, the consumer's income, the type of documentation used to prove that income, and the prevailing interest rates.  (5/18/06 H. Addington Aff. ¶ 28, Defs. App. Ex. 6.)  To evaluate creditworthiness, Defendants considered several variables, such as mortgage payment history, minimum credit score, history of bankruptcy, and debt-to-income ratio.  (*Id.* at ¶ 31; *see also* 11/7/05 B. McKay Aff. ¶ 14, Pls. St. App. J.)  Each applicant was also "graded" from "AA" to "C-" (AA, A+, A-, B, C, C-) based upon their personal credit characteristics. (11/7/05 B. McKay Aff. ¶ 13; 5/18/06 H. Addington Aff. ¶ 31.)  Defendants claim that, before they can determine specific loan terms, they first must obtain all the above information.  (H. Addington Dep. at 44.)  Only then can they present what different loan terms – including the applicable interest rate, monthly payment, amount of loan, and fees associated with the product –

an applicant qualified for.  (*Id.* at 44, 46-47.)

Once the loan amount was determined, Defendants set the interest rate.  (5/18/06 H. Addington Aff. ¶ 36.)  This depended on the consumer's credit score, grading, and loan type requested.  (*Id.*; B. McKay Dep. at 46., Pls. St. App. D.)  Interest rates were different for each borrower; however, the rates also reflected the prevailing interest rates at the time the loan was made.  (5/18/06 H. Addington Aff. ¶¶ 36-37.)  The prevailing interest rates changed often, usually on a monthly basis, but sometimes even more frequently.  (*Id.* at ¶ 37.)  Consequently, because many variables entered the equation for setting the interest rate, Defendants claim they couldn't know what specific rate to offer at the time the prescreening letter was sent.  (H. Addington Dep. at 118, Pl. St. App. F.)  But they do acknowledge that a range of rates could be provided.  (*Id.*)

During the class period, by way of comparison, Defendants also sent mailings to individuals who were not prescreened.  (*Id.* at 58-59.)  These individuals underwent a similar process to what was described above – a customer service representative directed the interested borrower to a local branch loan officer who reviewed the application and the credit reports.  (*Id.*)  This application, however, was identified as "not preapproved."  (*Id.*)  This individual therefore had to qualify under Defendants' "normal credit guidelines, as if they walked through the door."  (*Id.* at 59.)  In other words, the individual would need a mean FICO score from the three credit reporting agencies of at least 500.  (*Id.* at 73.)  A recipient of a prescreened offer of credit, on the other hand, need only have a 500 FICO score from the single bureau engaged to perform the prescreening.  (*Id.*)

Defendants also could deny a non-prescreened consumer a loan even if he met the pre-

6

screened criteria. (*Id.* at 41-42.) With respect to prescreened consumers, however, Defendants must honor the offer in the prescreened letter – as long as the consumer fulfilled any pre-established conditions. (*Id.* at 42.)

Finally, a prescreened consumer had the advantage of having the prescreened criteria apply during the entire time the offer was valid even if certain adjustments had been made to Defendants' underwriting guidelines during that time. (*Id.* at 112-13; B. McKay Dep. at 35, Pls. St. App. D.) For instance, Defendants changed the minimum loan amount from $35,000 to $50,000. (H. Addington Dep. at 111.) Any prescreened consumer who still had a valid letter offering a loan amount of $35,000 could obtain that loan despite Defendants having raised the minimum loan amount to $50,000 for general consumers. (*Id.* at 110-113.)

## II. PROCEDURAL HISTORY

Plaintiffs claim that Defendants violated 15 U.S.C. § 1681b of the FCRA by sending letters with mortgage offers that were vague and lacking in terms and hence, did not constitute a "firm offer of credit." (Compl. ¶¶ 56-60a.) Therefore, Defendants did not have a "permissible purpose" to obtain and use Plaintiffs' consumer report information. (*Id.*) Plaintiffs also claim that Defendants failed to provide the requisite consumer disclosures in a "'clear and conspicuous' manner," thereby violating 15 U.S.C. § 1681m. (*Id.* at ¶ 60b-d (citing § 1681m(d).) Finally, Plaintiffs assert that these violations were done in a willful manner in violation of 15 U.S.C. § 1681n. (*Id.* at ¶ 62.) Plaintiffs therefore seek statutory damages up to $1,000 and injunctive relief as well as attorney's fees and costs. (*See id.* at 12.)

The Court permitted the parties to bifurcate the threshold liability issues [DE 97].

Specifically, parties wished to postpone discovery and dispositive motions relating to whether

Defendants willfully violated the FCRA and whether Defendants established reasonable

procedures to assure compliance with § 1681m of the FCRA until the pending motions for

summary judgment were decided.  Accordingly, the parties' current motions for summary

judgment involve only whether Defendants provided "firm offers of credit" and whether the

disclosures in the letters were clear and conspicuous.

## III.  DISCUSSION

Summary judgment is proper where the "pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1028 (7th Cir. 2004).  The court

construes all facts and draws all reasonable inferences in the light most favorable to the

nonmoving party.  *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002).  When parties bring

cross-motions for summary judgment, the court should "construe the evidence and all reasonable

inferences in favor of the party against whom the motion under consideration is made."  *Premcor*

*USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005).

### A.      Firm Offer of Credit

15 U.S.C. §1681b states that a lender may obtain or use an individual's consumer report

in connection with a credit transaction only if "the transaction consists of a firm offer of credit."

15 U.S.C. § 1681b(c)(1)(B)(i).  Congress defined a "firm offer of credit" as "any offer of credit

8

or insurance to a consumer that will be honored if the consumer is determined, based on

information in a consumer report on the consumer, to meet the specific criteria used to select the

consumer for the offer, except that the offer may be further conditioned on one or more of the

following[.]" § 1681a(l).  Congress outlined those conditions as follows: (1) the consumer's

ability to meet specific pre-established creditworthiness criteria based on his application; (2)

verification of prescreened criteria that was initially used to select the consumer for the offer;

and (3) the consumer's ability to supply any needed collateral disclosed in the offer.  §

1681a(l)(1)-(3).

The purpose behind the FCRA was the belief that consumers were willing to reveal

sensitive credit information as long as they received firm offers of credit in return.  *See Cole v.*

*U.S. Capital, Inc.*, 389 F.3d 719, 726-27 (7th Cir. 2004).  Sales pitches, by contrast, do not

justify the intrusion.  *See id.*  We must analyze "the *entire* offer and the effect of *all* the material

conditions" of the credit product in question to determine whether the communication is a

legitimate firm offer of credit as opposed to a mere solicitation.  *Id.* at 728 (emphasis in original).

In making this determination, we must consider whether the offer has "sufficient value for the

consumer to justify the absence of the statutory protection of his privacy."  *Id.* at 726.  Without

such value, an offer of credit is really nothing more than a sales pitch.  *See id.* at 727.

The Seventh Circuit instructs us to look to the "four corners of the offer" to determine if

it is of value to a "normal consumer" as an offer of credit and then assess whether the terms are

honored when the consumer accepts.  *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 955-56

(7th Cir 2006).  *See also Forrest v. Universal Savings Bank F.A.*, 06-C-445, 2006 WL 3486913,

at *4 (E.D. Wis. Dec. 1, 2006) ("It is the court's job to determine whether the offer, within the

9

four corners of the document sent to consumer, satisfies the statutory definition."). If the offer

meets both these criteria, it fulfills the statutory definition of a "firm offer." *Murray*, 434 F.3d at

956.

> When assessing whether the offer is of value to a consumer,

>> one important term for courts to evaluate is the amount of credit to
>> be extended. However, neither a creditor nor a debtor considers
>> the amount of credit in a vacuum; both must know the other terms
>> attached to that credit to determine whether it is advantageous to
>> extend or to accept the offer. The terms of an offer, such as the
>> rate of interest charged, the method of computing interest and the
>> length of the repayment period, may be so onerous as to deprive
>> the offer of any appreciable value.

*Cole*, 389 F.3d at 728. In *Perry v. First National Bank*, 459 F.3d 816 (7th Cir. 2006), the

Seventh Circuit, in finding that a solicitation was a firm offer of credit, focused in part on the

fact that the solicitation contained specific interest rates and other terms. *Id.* at 824-825. It

distinguished the letters in *Cole* because they did not include the rate of interest and other

material terms. *Id.*

The key question here is whether the mortgage offers made by Defendants were firm

offers of credit or merely advertisements and solicitations. After considerable analysis of the

letters and applicable case law, the Court finds that the mortgage loan offers were the latter and

thus violated the FCRA. Defendants' mailings do not include any crucial terms, such as an

interest rate percentage, or a range of interest rate percentages, whether the offer is for a fixed or

variable rate mortgage loan, a reasonable estimate of the amount of the loan, the length of the

loan, how the loan was to be repaid, or any applicable fees.

Furthermore, even when a consumer responded to the mailer, Defendants still did not

make a firm offer of credit.  They first obtained the consumer's credit reports, had the consumer

fill out a credit application, analyzed the consumer's property and his creditworthiness, and

asked the consumer to select a specific loan program for which he qualified.  The consumer was

not provided with the value of Defendants' offers – that is, the loan terms – until this drawn-out

application process was completed and Defendants could determine what loan products the

consumer qualified for.  Thus, the initial letters received by Plaintiffs strike us more as a sales

pitch than a firm offer of credit.  *See Murray v. Finance America, LLC*, 05 C 1255, 2006 WL

862832, at *3 (N.D. Ill. April 4, 2006) (granting the plaintiff's summary judgment on "firm offer

of credit" claim because the mailer failed to state the amount of credit, the rate of interest or

ranges of rates of interest, the method by which interest would be computed, the repayment time,

whether a prepayment penalty applied, the amount of fees, costs, charges, or points, or

defendant's underwriting guidelines).

Defendants argue that the recipients of their prescreened letters did receive firm offers of

credit.  In arriving at that conclusion, Defendants maintain that the credit transaction as a whole,

which covers a broad range of lender-consumer interactions, must provide a firm offer of credit,

not just the initial offer letter.  (Defs. Reply at 3 (citing § 1681b(c)(1)(B)(i).)

But *Murray* states the contrary.  It specifically notes that courts "need only determine

whether the four corners of the offer" amount to a firm offer of credit.  *Murray*, 434 F.3d at 956.

What's more, *Cole* instructs that, when considering the value of the offer to the consumer, we

should consider the "terms of an offer, such as the rate of interest charged, the method of

computing interest and the length of the repayment period . . . ."  *Cole*, 389 F.3d at 728.  This

11

value must be reflected in the letter.  What else could the court in *Murray* have been referring to when it limited us to the "four corners" of the offer?  *See e.g., Murray v. Finance America, LLC*, 2006 WL 862832, at *3 ("In sum, these mailings are missing important, concrete terms of the home loans and confer little or no value to the consumer, instead, the letters simply invite the consumer to call [defendant] for more details."); *Murray v. Sunrise Chevrolet, Inc.*, 441 F. Supp. 2d 940, 946 (N.D. Ill. 2006) (holding that "cobbl[ing] together some mosaic of communication methods whereby a persistent consumer could learn all the details of the offer" fails to satisfy the FCRA); *Bruce v. Keybank Nat'l Ass'n*, 2:05-CV-330, 2006 WL 3743749, at *4 (N.D. Ind. Dec. 15, 2006).

We fail to see how a meaningful offer of credit could work in any other way.  Otherwise, the consumer (or for that matter, the Court) cannot evaluate the offer because he does not know the value until after completing the extensive application process and finally receiving a loan amount with its corresponding terms.  *See GMAC Mortgage*, 434 F.3d at 956 (holding that a court need not conduct an *ex post* analysis to determine whether a "firm offer of credit" had been extended); *Hernandez v. Citifinancial Servs., Inc.*, 05 C 2263, 2006 WL 1749649, at *3 (N.D. Ill. June 21, 2006) (noting that the Seventh Circuit rejected the defendant's claim that the specific terms of a consumer's offer was determined only after the consumer's creditworthiness had been evaluated).

The Federal Reserve Board's interpretation of the FCRA confirms this Court's reading of the statute and Seventh Circuit case law.  For example, it notes that the value of a prescreened offer to a consumer is that it "reduce[s] search costs by providing . . . ready information about product availability and pricing tailored more closely to [his or her] financial experiences and

needs." (Board of Governors of the Federal Reserve System, *Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit & Insurance* (Dec. 2004), at 3, Pls. Mem. App. A.) In other words, the offer to have value must contain enough information to enable a consumer to determine whether he should accept the offer. (*See Report to Congress*, at 5 ("[Because prescreened solicitations . . . must be 'firm' offers of credit, consumers gain better awareness of available credit products and rates.").

Defendants vigorously argue that the FCRA envisions continuing dialogue between lenders and potential borrowers. (Defs. Mem. at 9-10, 12.) If not, Defendants claim that they would be unable to obtain the additional information essential to consummating the loan. (*Id.* at 18.) The Court realizes that lenders, such as Defendants, must have the ability to confirm that a consumer continues to satisfy the prescreened criteria and that no substantive change has occurred in the consumer's credit or homeownership status. In fact, the statute expressly provides that lenders may verify such information. *See* § 1681a(l). This give-and-take between lenders and consumers is necessary to ensure that the consumer continues to be an acceptable candidate for the firm offer made by the lender. Moreover, the statute also permits Defendants to condition their offers on previously established criteria that the consumer must meet to receive the offer. Knowing whether a consumer fulfills a lender's pre-established criteria, such as income or type of homeownership, takes additional communication between the two parties. Thus, the Court agrees with Defendants that the FCRA permits further interaction between the lender and the consumer beyond the initial mailing.

But allowing such communications does not negate the requirement that the offer of credit must be framed in a way to allow the consumer to meaningfully evaluate it. *See Kudlicki*

13

*v. Farragut Financial Corp.*, 05 C 2459, 2006 WL 927281, at * 2 (N.D. Ill. Jan. 20, 2006)

(noting that the defendant's position that "circumstances outside the contents of the mailer are

relevant to a determination of whether defendant has extended a 'firm offer of credit' . . . [was

of] doubtful merit.") (citing *Murray v. GMAC Mortgage Corp*, 434 F.3d at 956).

We do not mean to suggest that all the loan terms or pre-established criteria must be fully

described to the consumer.  After all, the Court understands that mortgage offers are different

and possibly more complex than simple offers of credit through, for example, credit cards.  But

to reiterate, Defendants must include *some* material terms to allow a consumer to evaluate the

offer.  (*See e.g.*, Pls. Mem. App. E (solicitation containing examples of loan amount, rate, APR,

payment, etc.); *see also Report to the Congress on Further Restrictions on Unsolicited Written

Offers of Credit & Insurance*, at 5, Pls. Mem. App. A ("When consumers do review the

prescreened solicitations, they are most interested in the pricing information.").  Without these

terms, the consumer has no way to determine which offer, among the myriad he may receive, is

worthy of further investigation.  Consequently, a principal goal of the FCRA – to increase

competition in the marketplace – remains unrealized.  (*See Report to Congress*, at 28 ("[T]he

widespread dissemination of pricing and product information contained in prescreened offers

helps to make markets for these products more competitive, a result that benefits all consumers

. . . .").

In the alternative, Defendants argue that, even if lenders are required to provide certain

material terms, their mailings contain such terms.  (Defs. Mem. at 23.)  In particular, Defendants

point to the cash-back values and the stated range of the loan amount ($50,000 to $750,000) in

the two New Century letters.  (Pls. St. App. A & C.)  The third letter from Defendant Home123

provides a minimum loan amount of $50,000 and a hypothetical loan repayment example based on a set loan amount, repayment term and interest rate.  (*Id.* at App. B.)

These terms do not amount to a firm offer of credit.  First, the inclusion of cash back values is a side deal that is secondary to the primary offer of the mortgage loan.  Second, the vast range of only one material term ($50,000 to $750,000) is essentially meaningless because it does not allow a consumer to determine whether the offer has any value to him.  This is particularly true because Defendants did not give any interest rates that may assist in determining whether the terms of the offer are so "onerous as to deprive the offer of any appreciable value."  *Cole*, 389 F.3d at 728.  Finally, the sample of savings worksheet is simply that – a sample.  It has no bearing on the type of loan or its terms that a recipient of the mailing could obtain.

Indeed, the Defendants' ability to obtain a cash back value actually provides some insight into what they could have included in their mailings had they chosen to do so.  The vendor applied a calculation using a consumer's estimated home value and mortgage balance, two variables that were apparently obtainable through the prescreening process, to determine the maximum cash-back values.  It follows that Defendants also could have provided an estimated loan amount (or a more reasonable range of potential loan amounts) and a range of interest rates in the prescreened letter based upon a consumer's home value and mortgage balance.  It is true, as Defendants contend, that they didn't have these two figures for some consumers.  But that, of course, was their choice.  Defendants changed their criteria from eliminating those individuals whose home values were unknown to including them as potential recipients for Defendants' mailings.  If this criteria is necessary to provide a firm offer of credit, then Defendants may need to adjust their prescreened criteria.

In sum, these two terms – the loan amount and the interest rate (or ranges thereof), which were available to Defendants and could have been included in the mailings – would have shown the value of the offer to consumers. *See Murray v. New Cingular Wireless Servs., Inc.*, 432 F. Supp. 2d 788, 792 (N.D. Ill. 2006) ("In *Cole*, the precise rate of interest was not provided; however, in that case, the consumer would have to pay interest if he or she decided to accept the offer. Such information is pertinent to whether the consumer will decide whether to accept the offer or not.").

It is also compelling that there is minimal difference between the process of obtaining a loan between consumers who received prescreened mailings and those who received general solicitation letters. Defendants first distinguish the two types of consumers by claiming that they were required to honor the prescreened offer (as long as the prescreened consumer satisfied the offer conditions), whereas Defendants need not have done so with a general consumer. (Defs. Resp. at 9.) But this argument is neither here nor there because the letter does not contain a meaningful offer that Defendants must honor. Instead, the prescreened letter simply invites a consumer to review various types of mortgage loans for which he may qualify. As the Seventh Circuit has held, simply honoring an offer of credit is not sufficient to fulfill the statutory definition of a "firm offer of credit." *Cole*, 389 F.3d at 727-28.

A second difference raised by Defendants is that they relaxed their credit score criteria for the prescreened consumer, but more stringent criteria existed for the general consumer. (Defs. Resp. at 9-10 n.4.) In particular, the prescreened consumers had to have a FICO score of 500 or better from one of the three credit bureaus. By contrast, non-prescreened consumers had to have an average FICO score of at least 500 from all three bureaus. The Court does not see

16

how this trivial difference impacts whether a firm offer of credit was made.

Defendants assert a final difference – the prescreened criteria applied to the consumer during the entire term of the offer, even if changes to Defendants' underwriting guidelines, which were disadvantageous to the consumer, had occurred.  (Defs. Resp. at 9.)  A non-prescreened consumer, however, was measured by the criteria that existed when she applied – not when she received the general solicitation letter.  (*Id.*)  Again, we do not see this distinction as particularly persuasive.  The prescreened letter simply enlarged the time for which a consumer could apply for a loan based on certain underwriting guidelines.  More significantly, one of the most important terms – the interest rate – was determined at the time the loan was made, not when the prescreening took place.  In sum, there appears to be no substantive advantage to a consumer who received a prescreened mailing from Defendants.  *See Murray v. Sunrise Chevrolet, Inc.*, 441 F. Supp. 2d at 947 (including the fact that the pre-approved consumer was not treated differently than any other consumer to support a finding that the notice did not represent a firm offer of credit).

During oral argument, Defendants noted that consumers have access to interest rates on their website – apparently asserting that there is no need to include these rates in the letters as they are easily obtainable.  However, interest rates are determined at the time the loan is given, not when the consumer receives the letter.  And, of course, the interest rate can change a couple times in a month.  The burden on the consumer therefore increases when he must keep up with the interest rate fluctuations until the loan is approved.  Moreover, the final interest rate is determined by several variables based on consumer-specific factors.  As Defendants state, the exact interest rate for a prescreened borrower is based on his credit score, grade, and different

17

loan terms.  Thus, it is not as simple as Defendants claim for consumers to obtain the applicable interest rates.  But as Defendants noted, they could provide a range of interest rates, and – the Court believes – this would be relatively easier than requiring consumers to find the actual rates on their own.

An additional burden falls on consumers when, to compare various loan products and interest rates, they must complete the loan process with several lenders who run their programs similarly to Defendants.  The ability to compare products, a goal of the FCRA, is hindered when zero material terms are provided to consumers, who then are unable to compare various lenders' products without undergoing an intensive application process and credit check.  This burden is exacerbated because "credit records contain data on inquiries made about an individual's credit circumstances."  (*Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit & Insurance*, at 26, Pls. Mem. App. A.)  Plaintiff's counsel stated during oral argument (and Defendants did not dispute) that these inquiries, which indicate that the consumer is seeking additional credit, can negatively impact a consumer's FICO score.

Lastly, the Court finds that its holding is in accordance with the policies and goals of the FCRA.  As previously discussed, one of the key purposes of the FCRA is to promote competition among credit products in the marketplace.  Providing certain key terms in offers of credit will assure such a goal.  A further goal of the FCRA is "to protect consumers' interest in the privacy of information maintained by consumer reporting agencies."  (FTC Brief of Amicus Curiae in *Cole v. U.S. Capital, Inc.* (filed in 7th Cir.) at 15 (citing § 1681a(4) & *Trans Union Corp. v. FTC*, 245 F.3d 809, 812-13 (D.C. Cir. 2001), Defs. App. Ex. 11.)  Congress has balanced this priority against firm offers of credit, recognizing that "such offers provide

18

something of value to consumers, in return for which many consumers will be willing to yield a degree of privacy." (*Id.* at 16 (citing *Trans Union v. FTC*, 267 F.3d at 1143).)  But Congress barred any type of "target marketing," where a company obtains information about consumers "so that it can target its advertising to those consumers who possess certain characteristics." (*Id.* at 16-17.)  In this case, the mailings sent by Defendants had no meaningful economic value to the consumers.  Rather, it was a targeted invitation to peruse Defendants' several products provided the consumers qualified for such products.  Such mailings defeat the purpose of the FCRA.

### B.  Clear and Conspicuous Disclosures

Plaintiff Bonner contends that the mailing he received in July 2004 lacked the requisite consumer disclosures in a "clear and conspicuous" manner, as required by 15 U.S.C. § 1681m(d).[2]  Because we have determined that there was no "firm offer of credit" in any of the three letters at issue, we need not decide whether the required disclosures in the mailings were conveyed in a "clear and conspicuous" manner.  *See Cole*, 389 F.3d at 729 n.11 (noting that "[t]he requirements of clear and conspicuous disclosures are only triggered if a valid firm offer was extended.").  Accordingly, the parties' motions for summary judgment relating to § 1681m are denied as moot.

_____

[2]  When ruling on Defendants' Motion for Judgment on the Pleadings, the Court ruled that the Fair and Accurate Credit Transactions Act of 2004 ("FACTA") did not apply to mailings received before FACTA's effective date of December 1, 2004.  Thus, judgment on the pleadings was granted as to Exhibits B and D to the Complaint.  However, it was denied with respect to Exhibit A, which was sent to Plaintiff Bonner prior to that date.

**C.      Plaintiff's Objection To the Length of Defendant's Briefing**

Plaintiffs filed an objection to Defendants' Partial Motions for Summary Judgment,

claiming that Defendants violated Local Rule 7.1(d), which limits briefs to twenty-five pages, by

filing two motions instead of one.  Defendants therefore were able to file two memoranda (one

that was 25 pages long and one that was 18 pages long) instead of a single brief of no more than

25 pages.  Defendants argue that "the use of multiple motions is particularly appropriate here[,

because if] this Court were to rule that New Century did not comply with § 1681b as a matter of

law, there would be no need for this Court to consider either parties' briefs concerning §

1681m."  (Defs. Resp. to Obj. [DE 119] at 2.)  The Court finds this reasoning persuasive,

particularly as such an outcome has occurred.  Furthermore, Plaintiffs have not been prejudiced

by the two partial motions filed by Defendants.  Plaintiffs filed separate responses to each Partial

Motion, thus negating any potential prejudice brought on by the additional briefing.

Accordingly, Plaintiffs' Objection is overruled.

## IV.  CONCLUSION

For the above reasons, Plaintiffs' Motion for Summary Judgment as to Firm Offer [DE

101] is **GRANTED**.  Plaintiffs' Motion for Summary Judgment as to Disclosure Violations [DE

101] is **DENIED AS MOOT.**  Defendants' Motion for Partial Summary Judgment on Plaintiffs'

Claim for Relief under 15 U.S.C. § 1681b [DE 106] is **DENIED**.  Defendants' Motion for Partial

Summary Judgment on Plaintiffs' Claim for Relief under 15 U.S.C. 1681m [DE 108] is

**DENIED AS MOOT**.  Furthermore, Plaintiffs' Objection [DE 120] is **OVERRULED**, and

Plaintiffs' Motion for Leave to Supplement the Record [DE 171] is **DENIED AS MOOT**.

     **SO ORDERED**.

     ENTERED: March 9, 2007

                        s/ Philip P. Simon
                        PHILIP P. SIMON, JUDGE
                        UNITED STATES DISTRICT COURT